996 F.2d 1220
 NOTICE: Seventh Circuit Rule 53(b)(2) states unpublished orders shall not be cited or used as precedent except to support a claim of res judicata, collateral estoppel or law of the case in any federal court within the circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Randy GLASS, Stephanie Glass, Douglas Hollie, and Armand
Moore, Defendants-Appellants.
 Nos. 91-1514, 91-1526, 91-1912 and 91-2199.
 United States Court of Appeals, Seventh Circuit.
 Argued June 4, 1993.
Decided June 23, 1993.
 
 Before CUMMINGS, FLAUM and EASTERBROOK, Circuit Judges.
 
 Order
 
 1
 Armand Moore plotted an escape from his federal prison--not only to obtain his freedom but also to carry out a financial fraud, having enlisted the aid of a collaborator in the Federal Reserve Bank of Detroit. Randy Glass, a guard at the prison, was to aid in the escape in exchange for $300,000 from the proceeds of the fraud. Randy's wife Stephanie and Douglas Hollie had roles on the outside of the prison. Through a combination of luck, good detective work, and the assistance of one of Moore's associates, federal agents foiled both the escape and the fraud. All four were convicted of conspiring to get Moore out of prison and defraud the Federal Reserve Bank, and of associated offenses. Moore was sentenced to 300 months in prison, Randy Glass to 57 months, Stephanie Glass to 36 months, and Hollie to 30 months.
 
 
 2
 The four defendants present a large number of contentions on appeal. For example, defendants contend that the prosecutor really established two conspiracies (one to escape and another to commit the fraud) rather than one conspiracy with two objectives. Criminal conspiracies lack formal charters, so it is always possible to debate their scope and objectives. We are satisfied, however, that the jury was entitled to conclude that this conspiracy had the scope attributed to it in the charge. Moore unquestionably had both objectives. Randy Glass, originally willing to accept a fixed fee of $100,000 for his assistance, later agreed to wait for a higher payoff after the completion of the fraud. This implies that Randy was aware of and agreed to both objectives. Other evidence suggests that Stephanie Glass and Hollie likewise understood and joined in pursuit of the multiple objectives. Similarly, the jury was not required to accept Stephanie Glass's argument that she and her husband intended to defraud Moore by keeping the $20,000, which he had provided to cover some of the costs, without helping him escape. All of Stephanie's conduct and recorded conversations are consistent with genuine participation in the scheme; her assertions about a private intent presented an issue of credibility for the jury.
 
 
 3
 Miscellaneous claims of trial error fare no better. Evidence concerning Moore's prior bank fraud (for which he was in prison) was properly admitted so that the jury could understand why his confederates would believe that he could obtain $400 million from the Federal Reserve and agree to assist him. United States v. Hargrove, 929 F.2d 316, 320 (7th Cir.1991). Whether to permit such evidence in light of its potential for improper use is committed to the district court's discretion, which was not abused. Severance was properly denied under the standard of Zafiro v. United States, 113 S.Ct. 933 (1993), and the mid-trial production of the "Keating report" did not violate anyone's rights. The prosecutor offered open-file discovery. That Moore's lawyer did not take advantage of the opportunity did not oblige the prosecutor to work the photocopier through the evening. United States v. Driver, 798 F.2d 248, 252 (7th Cir.1986). Keating himself did not testify, and even if his report is viewed as exculpatory (which it is not), it was disclosed during the trial. Brady v. Maryland, 373 U.S. 83 (1963), requires no more. That case established a disclosure rule, not an obligation to provide pretrial discovery. See Weatherford v. Bursey, 429 U.S. 545, 559 (1977); United States v. Agurs, 427 U.S. 97, 108-12 (1976).
 
 
 4
 Strongest is Moore's contention that the district judge should not have imposed a sentence higher than the range according to the Sentencing Guidelines. The district court computed an offense level of 30 after grouping the three counts and making several adjustments. This included 4 offense levels under U.S.S.G. § 3B1.1 for being the ringleader. Finally, the court added 4 more levels, in an upward departure, on the theory that Moore's ability to organize so many previously law-abiding persons into a criminal conspiracy showed that he possesses a rare skill--a sort of Pied Piper ability that the Guidelines do not expressly take into account. These extra 4 levels added approximately 8 years to Moore's sentence, and he contends that the 4 points under § 3B1.1 for being a ringleader should have sufficed.
 
 
 5
 Both the Sentencing Reform Act and the Guidelines permit departures on account of circumstances that the Sentencing Commission did not fully consider. The district judge explained his rationale in this way:
 
 
 6
 The ordinary offender ... who is sentenced as an organizer and leader and what was intended by the Sentencing Commis[s]ion was the kind of person who gathers together with himself or herself a group of more or less like-minded persons, and by virtue of organizing ability and leadership ability forges ... a new group more effective because it is a larger number of people acting in concert.
 
 
 7
 [Moore] went a bit beyond that, quite a bit beyond that, because he did not forge together a group of criminals. He made in a significant sense of the word criminals out of people who were otherwise law-abiding, and that ... present[s] a significant danger because ... one who can broaden the scope of available talent by being able to recruit those who had otherwise led lives free of crime and who had in fact achieved acceptability in society presents a greater danger, simply because the pool of his recruits is much, much larger; and because the pool of recruits is much, much larger, the menace to society is also increased.
 
 
 8
 The district judge extended the analysis, but this excerpt suffices. The essential question is whether the judge worked within the structure of the Guidelines and made a reasoned choice. The answer is yes.
 
 
 9
 Moore displayed his organizational skills repeatedly. While on release after a conviction for one financial fraud, he organized a group of previously honest employees of the First National Bank of Chicago so effectively that a $70 million fraud could be committed within a week. Then while in custody pending his sentencing for that crime, he began organizing the group he would need to avoid imprisonment (by escaping on the very day of his sentencing for the First Chicago fraud) and commit a new, and larger, fraud on the Federal Reserve Bank of Detroit. This is a skill rarely seen. Moore downplays his abilities, observing that he has been caught repeatedly. Yet this is true of everyone in the dock for sentencing; the really successful criminals escape detection or prosecution. The district judge did not abuse his discretion in concluding that Moore has unusual skills among the population of criminals who fail to get away with their schemes.
 
 
 10
 Defendants' other contentions have been considered and do not require separate discussion.
 
 
 11
 AFFIRMED.